UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SONJA M. OVERALL,

      Plaintiff,

v.                                                           Case No. 20-12869

OAKLAND COUNTY, *et al.*,                    Sean F. Cox
                                                             United States District Court Judge

      Defendants.

_____/

**OPINION AND ORDER**
**GRANTING SUMMARY JUDGMENT IN FAVOR OF**
**LAPEER AND OAKLAND COUNTY DEFENDANTS**

      This case arises from the tragic death of Eric Overall, a Deputy with the Oakland County

Sheriff's Office, that occurred on November 23, 2017.  Deputy Overall was killed in the line of

duty, while assisting Lapeer County sheriff's deputies in their attempt to stop a vehicle being

driven by Defendant Christopher Berak ("Berak").  During the course of that high speed police

pursuit, Berak steered his vehicle off the road and directly into Deputy Overall (who was

standing to the side of road attempting to deploy stop sticks), killing Deputy Overall.  Plaintiff

Sonja M. Overall, individually and as Personal Representative of the Estate of Deputy Overall

("Plaintiff") filed this § 1983 action, asserting claims against a number of Defendants.  At this

time, the only remaining Defendants are Oakland County, Lapeer County, four Lapeer County

officers, and Defendant Berak.  Discovery has closed and the matter is before the Court on

summary judgment motions filed by Oakland County and the Lapeer County Defendants.  The

parties have briefed the issues and oral argument was heard on March 30, 2023.

      For the reasons set forth below, the Court grants both motions and rules that Oakland

1

County and the Lapeer County Defendants are entitled to summary judgment as to the claims asserted against them. The only claims that Plaintiff asserts against the Lapeer County officers are gross negligence claims under Michigan law. Those claims fail because Plaintiff cannot establish that the conduct of any of the officers was "the" proximate cause of Deputy Overall's death. That leaves Plaintiff's § 1983 count, that is asserted against Oakland and Lapeer Counties only. The counties are entitled to summary judgment in their favor on that count because: 1) any § 1983 claim asserted against the counties based on the Michigan Constitution fails to state a § 1983 claim; 2) Plaintiff has no cognizable Fifth Amendment Due Process claim against either of the counties because that Amendment only applies to federal, not state, conduct; and 3) Plaintiff cannot maintain a substantive-due-process claim against either county, on a "state-created-danger" theory of liability, because Plaintiff cannot establish the culpability required for such a claim. Thus, the Court dismisses the § 1983 count with prejudice.

That leaves Defendant Berak as the sole remaining Defendant in this case.

## BACKGROUND

On October 27, 2020, Plaintiff filed this § 1983 action, asserting claims against a number of Defendants. At this juncture, the operative complaint is Plaintiff's First Amended Complaint.[1] In it, Plaintiff names the following Defendants: 1) Oakland County; 2) Lapeer County; 3) Genesee County; 4) Kenneth Paul ("Paul"); 5) Christopher Boshell ("Boshell"); 6) Christopher Bowman ("Bowman"); 7) Harry Lutze ("Lutze"); and 8) Berak. The claims against Defendant Genesse County were dismissed with prejudice in a stipulated order issued on September 26,

---

[1] Plaintiff sought to file a second amended complaint, 14 months after the deadline for amendments to the pleadings and after the already-extended discovery period had closed. This Court denied that motion in an Opinion and Order issued on September 27, 2022.

2022.  All of the other Defendants remain in the case.

Plaintiff's First Amended Complaint asserts two counts: 1) "Violation of 42 U.S.C. § 1983" (a federal claim) (Count I); and 2) "Gross Negligence" (a state-law claim) (Count II). This Court has federal-question jurisdiction over Plaintiff's § 1983 claim and may exercise supplemental jurisdiction over the state-law count.  Plaintiff's First Amended Complaint refers to "Defendants" as having committed the alleged § 1983 violations but it includes only references to the county-defendants, and no references to the individual Defendants.  The opposite is true of the state-law gross negligence count, it references only the four Defendant officers and not the counties (or Berak).

Defendant Berak (the civilian who was convicted of killing Deputy Overall) is a named defendant in this case, although neither count appears to be asserted against him.  Berak filed a *pro se* Answer, contesting his liability in this case and asserting that he is not a state actor.  (ECF No. 13).  At the March 30, 2023 hearing, Plaintiff's counsel confirmed that Plaintiff is not asserting the § 1983 count against Berak, as he is not a state actor.  (*See* 3/30/23 Tr.).

The § 1983 count in Plaintiff's First Amended Complaint alleges that the conduct of Oakland and Lapeer counties "deprived Deputy Overall of his right to due process of law pursuant to the Fifth and Fourteenth Amendments to the United States Constitution, and pursuant to Article 1, Section 7 of the Michigan Constitution."  (Am. Compl. at ¶ 64).

After the close of discovery, all remaining Defendants except Berak filed motions for summary judgment.  On December 2, 2022, a summary judgment motion was filed by Lapeer County and Defendants Paul, Boshell, Bowman, and Lutze.  (ECF No. 115).  On that same date, Oakland County filed its summary judgment motion.  (ECF No. 110).

This Court's practice guidelines are included in the Scheduling Order and provide, consistent with Fed. R. Civ. P. 56 (c) and (e), that:

> a.  The moving party's papers shall include a separate document entitled Statement of Material Facts Not in Dispute.  The statement shall list in separately numbered paragraphs concise statements of each undisputed material fact, supported by appropriate citations to the record. . .
>
> b.  In response, the opposing party shall file a separate document entitled Counter-Statement of Disputed Facts.  The counter-statement shall list in separately numbered paragraphs following the order or the movant's statement, whether each of the facts asserted by the moving party is admitted or denied and shall also be supported by appropriate citations to the record.  The Counter-Statement shall also include, in a separate section, a list of each issue of material fact as to which it is contended there is a genuine issue for trial.
>
> c.  All material facts as set forth in the Statement of Material Facts Not in Dispute shall be deemed admitted unless controverted in the Counter-Statement of Disputed Facts.

(Scheduling Order at 2-3).

The Lapeer Defendants complied with the Court's practice guidelines for summary judgment motions such that their motion includes a "Statement of Material Facts Not In Dispute" ("L. Defs.' Stmt.") and Plaintiff filed a "Counter-Statement of Disputed Facts" (Pl.'s L. Stmt."). Defendant Oakland County also complied by filing its "Statement of Undisputed Material Facts" (Def. O.'s Stmt.") and Plaintiff filed a counter-statement ("Pl.'s O. Stmt.).

This lawsuit arose out of the tragic death of Oakland County Sheriff's Deputy Eric Overall ("Overall") after he was murdered in the line of duty by Defendant Berak, just after midnight on November 23, 2017.  (L Stmts. at ¶ 1).

The relevant evidence submitted by the parties is as follows.  There is video evidence of the events and the parties agree as to what those videos depict.

On the night in question, Defendants Paul, Boshell, and Bowman were Lapeer County

4

Sheriff's Deputies who were on duty.  (L Stmts. at ¶ 2).  Defendant Lutze was a Lapeer County Road Patrol Sergeant who was also on duty that night.  (Lutze Dep. at 6).

Deputy Overall was on duty, working for Oakland County, on the night in question. Non-party Sergeant Stephen Law has been employed by the Oakland County Sheriff's Department for 26 years and has been a Sergeant since 2013.  On the night of the incident, Sgt. Law was assigned as command sergeant of Oakland County's dispatch center.  (O Stmts. at ¶ 8).

Shortly before midnight on November 23, 2017, Lapeer County 911 received a telephone call from a male stating that he was at the Lapeer County Jail, claiming to "be God" and asking for assistance in breaking his son out of jail.  (L Stmts. at ¶ 3).

At that time, Paul and Boshell were at the Lapeer County Sheriff's Department typing reports when Boshell received a call from the Lapeer County Jail that a man was in the Jail parking lot, adjacent to the Sheriff's Department, claiming to be God, frantically searching through his vehicle and not making sense.  (L Stmts. at ¶ 4).

The Deputies walked outside and Paul observed Berak take off out of the Sheriff's Department parking lot, driving over a curb as he headed toward the Thumb Correctional Facility, which is located just a short distance away from the Lapeer County Jail.  (L Stmts. at ¶ 5).  Deputies Paul and Boshell got into their separate patrol vehicles and drove to the prison, where a prison guard alerted Paul that Berak was leaving out of the entrance and driving back toward the Lapeer County Sheriff's Department.  (L Stmts. at ¶ 6).

Deputy Paul activated his overhead lights and both Paul and Boshell followed Berak to the Sheriff's Department, where Paul approached his driver's side window and Boshell approached his passenger side.  (L Stmts. at ¶ 7).  Deputy Paul asked Defendant Berak to provide

5

his identification but he refused to do so, claiming that he was "God." (L Stmts. at ¶ 8).  The

operator of a motor vehicle who refuses to provide his driver's license at the request of a police

officer has committed a misdemeanor under Michigan law.  (L Stmts. at ¶ 9).  Berak further

advised that he was there to break his friend "Chris" out of jail before taking off again, this time

heading toward westbound on I-69. (L Stmts. at ¶ 10).

Deputy Paul followed Defendant Berak, with Deputy Boshell behind him, advising his

supervisor, Sgt. Lutze, on the police administrative channel of what was occurring.  (L Stmts. at

¶ 11).  Paul testified as follows as to why he pursued Berak:

> Q.    Why did you pursue Berak from the jail?
> . . . .
> A.    Because, again, he wasn't making any sense, stating that he was God,
>       stating that he was trying to get somebody out of jail or prison, showing
>       up around midnight when there are no visitation hours – there is no
>       visitation time at midnight.  And even when he left the parking lot the first
>       time, he hopped over the curb, so I needed to know – or was trying to find
>       out more about what was going on, what his reason was for being there
>       and to figure out what the best course of action with him was.

(Paul Dep. at 22-23).

On I-69, Deputy Paul observed Defendant Berak commit a traffic violation and pulled

him over.  (L Stmts. at ¶ 12).  Paul testified that he wanted to speak to Berak to further assess the

situation because Berak had committed a traffic offense, was not making sense, was claiming to

be God, was trying to get someone out of jail after midnight when no visitors are permitted and

had hopped a curb.  Paul also wanted to continue his well-being check on Berak. (Paul Dep. at

15, 23, 77-78).

Deputies Paul and Boshell approached the passenger side of Berak's vehicle and Deputy

Paul asked him to shut off the vehicle or put it in park, but Berak refused.  (L Stmts. at ¶ 14).

Berak continued to refuse to identify himself, again stating that he was God and that he did not have to comply with Deputy Paul's laws. (L Stmts. at ¶ 15).

Paul testified that "Berak stated that if I continued to pursue him or follow him he would kill himself" and that Berak then "left the traffic stop while he was not free to leave and was still being detained." (Paul Dep. at 16). Boshell testified to Berak's suicide threat as well. (Boshell Dep. at 20). Paul and Boshell both testified that they believed Berak to be a threat to himself and others on the roadway because he made suicidal statements and because of his erratic behavior. They wanted to take Berak into custody to ensure that he did not hurt himself or members of the public. (Paul Dep. at 30, 33-34, 50-51, 84-87, 120 and Boshell Dep. at 26).

Deputies Paul and Boshell then ran to their respective patrol vehicles, activated their lights and sirens, and began pursuing Berak. Deputy Paul was the lead vehicle and Deputy Boshell was the secondary vehicle in the pursuit. (L Stmts. at ¶ 19). Paul testified that the lights and sirens were activated to indicate for Berak to pull over and to serve as "a warning to any public that may be out on the roadways at that time." (Paul Dep. at 30).

Deputy Paul advised dispatch that he and Boshell would be pursuing Berak. Throughout the pursuit, the Deputies called out their speeds, their locations and traffic conditions so they could advise Sgt. Lutze,[2] who was overseeing the pursuit, of what was occurring. (L Stmts. at ¶ 21).

During the pursuit, traffic conditions were light and the road conditions were dry. The speeds were at or near the posted limits. (L Stmts. at ¶ 22). Because the pursuit was on

---

[2]Lutze, a road patrol sergeant with 24 years of experience, supervised the pursuit. (Lutze Dep. at 6 & 35).

7

expressways, however, this means that the speeds reached 70 miles per hour and more.  (*See*, eg., ECF No. 136-15 at PageID.6763).  In addition, it was dark outside, as the pursuit occurred at nighttime.

After the pursuit began, other officers, including some from other jurisdictions,[3] joined the pursuit.

During the pursuit, Deputy Paul tried to capture Berak's attention and get him to pullover by using a spotlight on his patrol vehicle. He also used the spotlight to alert other motorists of the pursuit.  (L Stmts. at ¶ 24).

Deputy Bowman, who had Reserve Officer Eric Shaw riding with him that night, was on regular patrol in the City of Lapeer when he received information over dispatch that Deputies Paul and Boshell were pursuing a subject who had threatened to drive his car into a tree.  (L Stmts. at ¶ 25).  Deputy Bowman drove toward the area where the pursuit was proceeding to be available in the event Deputies Paul and Boshell needed assistance and to ensure they were safe. Deputy Bowman understood that Defendant Berak threatened to commit suicide, so he believed that Deputies Paul and Boshell would need help in this "risk of life situation."  (L Stmts. at ¶ 26).

Deputy Bowman did not reach the pursuit until several minutes after it commenced and after it entered into Genesee County.  (L Stmts. at ¶ 27).  Deputy Bowman advised Sgt. Lutze over the police radio that he would be joining the pursuit to assist his fellow officers and followed at a slight distance.  (L Stmts. at ¶ 28).

Sergeant Lutze, the supervisor overseeing the pursuit, testified that he believed more than

---

[3]Lutze testified that the Michigan State Police became aware of the pursuit but declined to join it because it violated their policy to do so.  (Lutze at 35-36).

8

two cars were needed because Berak was unstable and unpredictable.  (Lutze Dep. at 74).

The pursuit traveled along I-69 to southbound M-15, into Genesee County and, as Berak continued to flee on southbound M-15, eventually into Oakland County.  (L Stmts. at ¶ 30).

As the pursuit continued, Lapeer County 911 dispatchers monitored the Lapeer police radio traffic, while the Deputies consistently reported the location of the pursuit. While that occurred, Lapeer 911 relayed that same information to Oakland County dispatchers.  (L Stmts. at ¶ 31).

Sgt. Lutze had the ultimate authority to terminate the pursuit.  Lutze testified that he did not do that because he believed Berak to pose an imminent threat to himself and everyone on the roadway that night.  (Lutze Dep., pp. 34, 36-37, 40, 53).

As the pursuit continued, non-party Metamora Police Officer Cameron Plowman requested that Oakland County set up stop sticks[4] to disable Berak's vehicle and end the pursuit. (L Stmts. at ¶ 32; Plowman Dep. at 42).  Plowman testified that, at that time, he was the third vehicle that was pursuing Berak:

> Q.    You were the third vehicle in the caravan that evening?
> A.    Yes.
> Q.    Why did you in that position ask Oakland County to deploy stop sticks?
> A.    Being in that position that gives me the ability to communicate, let the first and second vehicles drive, that gave me the ability to communicate and ask for spike strips to end the pursuit.

(Plowman Dep. at 42).

Oakland County Sergeant Law, the command sergeant on duty that night, testified that

___

[4]"'Stop sticks' are a device which can be placed across the roadway and used to flatten a vehicle's tires slowly" in order to end a pursuit.  *Scott v. Harris*, 550 U.S. 372, 397 n.9, 127 S.Ct. 1769 ((2007) (Stevens, J., dissenting)

Lapeer County asked for assistance for a suicidal subject that was not stopping for them.  (Law

Dep. at 121-22).

Sergeant Law became aware that there had been a request for stop sticks during the

pursuit.  He further testified:

> Q.    And did you respond or approve that request?
> A.    Well, I would have authorized that – I would have advised that we have
>        the ability to deploy stop sticks.  The deployment of the stop sticks at the
>        scene is at the discretion of the deputy having been trained.

(Law Dep. at 64-65).

Oakland County Deputy Overall was in his police vehicle, near the area of the pursuit,

when a dispatch relayed that the pursuit was at Glass Road and M-154, proceeding at 58

miles per hour.  (L Stmts. at ¶ 36).  34 seconds later, he parked his police vehicle on the shoulder

of Seymour Lake Road at its intersection with M-15 and exited his squad car.  (L Stmts. at ¶ 37).

Deputy Overall's dashcam video captured him getting out of his vehicle and captured the sound

of police sirens from the approaching pursuit, indicating that they were audible to the Deputy.

(L Stmts. at ¶ 38).

Deputy Overall then ran across M-15, carrying the stop sticks, and stood on the west

shoulder as he deployed them onto the roadway at the T-intersection of 15 and Seymour Lake

Road.  (L Stmts. at ¶ 39).  Deputy Overall attempted to deploy stop sticks without any cover.  (O

Stmts. at ¶ 70).  That is, Deputy Overall had no cover or concealment in the area where he chose

to deploy the stop sticks and did not have the ability to run away from the road because a marsh

runs parallel to M-15 in that area.  (L Stmts. at ¶ 40).

As the pursuit neared the intersection of M-15 and Seymour Lake Road, Dispatch

advised the Deputies over the police radio that Oakland County had stop sticks set up at M-15

and Seymour Lake Road. (L Stmts. at ¶ 41).

As he neared that intersection, Deputy Paul created a distance between his vehicle and Berak's vehicle. He saw Deputy Overall positioned on the west shoulder of the roadway, to his right.  (L Stmts. at ¶ 42).

While Deputy Overall was attempting to deploy stop sticks on the shoulder of southbound M-15, Mr. Berak applied the brakes to his vehicle, steered the vehicle to the right, off the roadway, and struck Deputy Overall. (O Stmts. at 72).

Upon reaching the scene, Deputies Paul and Boshell ran out of their patrol vehicles and toward Berak's car, ordering him out at gunpoint. When he would not comply, Deputy Paul had to break a window to open the locked door.  (L Stmts. at ¶ 44).

Deputy Paul advised other officers who had arrived on scene that a Deputy had been hit and he did not know where that Deputy was.  (L Stmts. at ¶ 45).  Deputy Boshell noticed Deputy Overall's jacket underneath Berak's vehicle and alerted the other Deputies on scene that he was under the car.  (L Stmts. at ¶ 46).  Deputy Bowman instructed the officers that they needed to lift the vehicle off of Deputy Overall in order to get him out from under the vehicle so CPR could be started. Deputies continued CPR until EMS arrived but Deputy Overall never displayed any sign of life after being struck by Berak. (L Stmts. at ¶ 47-48).

Berak was later convicted of first degree murder in Oakland County Circuit Court for the death of Deputy Overall.  (*See* Pl.'s Am. Compl. at ¶ 60).  The jury convicted Berak of: 1) first degree, pre-meditated murder under Mich. Comp. Laws § 750.316(1)(a); and 2) first degree murder of a peace officer under Mich. Comp. Laws § 750.316(1)(d).  (*See* Lapeer Defs.' Ex. L).

Berak's conviction for first degree murder was affirmed on appeal[5] and Berak is serving a life sentence without the possibility of parole for the murder of Deputy Overall.

## ANALYSIS

### I.   The Individual Lapeer Defendants (Paul, Boshell, Bowman, And Lutze)

The Lapeer Defendants filed a joint Summary Judgment Motion, that challenges the claims against both the individual Defendants and the County.  There are four Defendants in this case who are officers with Lapeer County:  Paul, Boshell, Bowman, and Lutze.  Likely acting out of an abundance of caution, they construed Plaintiff's First Amended Complaint as asserting both the § 1983 count and the state-law gross negligence count against them.

### A.   § 1983 Claims

The four individual Defendants assert that they are entitled to qualified immunity as to any § 1983 claims asserted against them in this case.  In response to their summary judgment motion, however, Plaintiff indicates that Plaintiff is not asserting any § 1983 claims against the individual Defendants named in this case: "Plaintiff charged Lapeer County with violating Deputy Overall's § 1983 rights and NOT an individual employee of the County."  (Pl.'s Br., ECF No. 136, at PageID.5829).  The body of Plaintiff's Amended Complaint supports this, as the      § 1983 count only references the County Defendants.  Thus, because Plaintiff is not asserting any § 1983 claims against the individual Defendants named in this case, no qualified-immunity analysis is necessary.

---

[5]*See People v. Berak*, 2021 WL 4024330 (Mich. App. Sept. 2, 2021) ("Affirmed, but remanded for the trial court to correct the judgment of sentence to reflect a single first-degree murder conviction supported by alternate theories of premeditated murder and murder of a peace officer.").

## B.     State-Law Gross Negligence Claims

Plaintiff is asserting only the state-law gross negligence count against these four

individual Lapeer Defendants.[6]

As the individual Lapeer Defendant's note, Michigan's Governmental Tort Liability Act

("GTLA") bars ordinary negligence claims against governmental employees such as these

officers.   Under Michigan law, an officer is immune from tort liability if three conditions are

met:

> (a) The officer, employee, member, or volunteer is acting or reasonably believes
> he or she is acting within the scope of his or her authority.
>
> (b) The governmental agency is engaged in the exercise or discharge of a
> governmental function.
>
> (c) The officer's, employee's, member's, or volunteer's conduct does not amount
> to gross negligence that is the proximate cause of the injury or damage.

*Hyman v. Lewis*, 27 F.4th 1233, 1238 (6th Cir. 2022); Mich. Comp. Laws § 691.1407(2).

"Gross negligence" is defined under the Act as "conduct so reckless as to demonstrate a

substantial lack of concern for whether an injury results."  Mich. Comp. Laws § 691.1407(8)(a).

The parties do not dispute that the officers were acting within the scope of their authority and

were engaged in the discharge of their government functions.  Thus, the only issues go to

whether their conduct amounted to gross negligence that caused the death of Deputy Overall.

Defendants Paul, Boshell, Bowman, and Lutze contend that they are entitled to summary

judgment as to Plaintiff's gross negligence claims for several reasons.  They contend that

Plaintiff's gross negligence claims against them fail because: 1) Plaintiff cannot establish that

---

[6]These state-law claims are not asserted against either of the county Defendants.

13

these individual Defendants owed a duty "to Deputy Overall, a trained law enforcement officer of another agency, to protect him against the unforeseeable criminal acts of a third party, Defendant Berak" (Defs.' Br. at 21); 2) Plaintiff cannot establish any reckless conduct on the part of these officers such as is required to establish gross negligence; and 3) Plaintiff cannot establish that the conduct of any of these officers was "the" proximate cause of Deputy Overall's death.  While all of these challenges appear to have merit, the Court need not address them all.

As the Sixth Circuit explained in *Burwell v. City of Lansing*, 7 F.4th 456, 478 (6th Cir. 2021):

> In Michigan, to overcome governmental immunity, a plaintiff must prove that the defendant's gross negligence was " 'the proximate cause[,]'[which] ... means the one most immediate, efficient, and direct cause preceding an injury, not 'a proximate cause.' " *Robinson v. City of Detroit*, 462 Mich. 439, 613 N.W.2d 307, 311 (2000); *see also Ray v. Swager, 501 Mich. 52, 903* N.W.2d 366, 371–76 (2017). In *Robinson*, the Michigan Supreme Court held that passengers injured in a car accident following a police chase could not overcome governmental immunity because "the one most immediate, efficient, and direct" cause of the passengers' injuries was the reckless conduct of the vehicle's driver, not any alleged reckless conduct of the police. *Robinson*, 613 N.W.2d at 319.

*Id*.  The Sixth Circuit has observed that "[e]stablishing proximate cause is a high bar" under Michigan's GTLA.  *Walker v. Detroit Pub. Sch. Dist*., 535 F. App'x 461, 467 (6th Cir. 2013).

In opposing Defendant's challenge, Plaintiff asserts that a jury could find that any one of these individual Defendants were negligent and that they "were **a** proximate cause of" Deputy Overall's death.  (Pl.'s Br. at 39) (emphasis added).  Plaintiff relies on *Ray v. Swager*, 501 Mich. 52 (2017).  That reliance is misplaced.

"No matter how one reads *Swager*, it explicitly affirms *Robinson*" – that in order to be grossly negligent, a human actor's conduct must meet the "high bar" of being "the" proximate cause of the injury.  *Reilly v. Ottawa Cnty, Mich.,* 2021 WL 3929324 at * 8 (6th Cir. 2021).

14

This case can be readily distinguished from *Swager*.  In *Swager*, an adult cross-county coach took his team running in public roadways early in the morning, when it was still dark outside.  The plaintiff was a thirteen-year old boy and the date in question was the first time he had run with the team.  During the run, the "team approached an intersection with a two-lane highway.  The 'Do Not Walk' symbol was illuminated because the traffic light was green for the highway traffic." *Id*. at 59.  Although the coach saw a vehicle coming, he thought it was far enough away that the team could cross and "instructed the runners to cross the intersection by stating, 'Let's go.'" *Id.* at 60.  A vehicle hit the plaintiff and one of his teammates as they crossed the intersection.  The driver of the vehicle "testified that he suddenly saw the runners crossing the intersection off to the right side of the road but that he did not see plaintiff in the intersection or have time to brake." *Id*. The driver also "testified that he was not distracted and had been driving below the posted speed limit" and the Washtenaw County Sheriff's officer concluded "the driver was not responsible for the accident." *Id*. at 60.

The trial court denied the coach's summary judgment motion, ruling that whether the coach's actions were grossly negligent, and whether his actions were the proximate cause of the plaintiff's injuries, were questions of fact for the jury.

The appellate court reversed, concluding "that any factual disputes were not material because reasonable minds could not conclude that defendant was the proximate cause of plaintiff's injuries," because the panel "determined that the presence of the driver in the roadway and plaintiff's own actions were more immediate and direct causes of plaintiff's injuries and held that 'the most proximate cause of [plaintiff's] injuries is the fact that he was struck by a moving vehicle.'" *Id.*

15

The Michigan Supreme Court vacated and remanded.  In doing so, it explained that "only a human actor's breach of duty can be a proximate cause."  *Id.* at 72. Thus, "nonhuman and natural forces, such as a fire, cannot be considered 'the proximate cause' of a plaintiff's injuries for the purposes of the GTLA."  *Id.*  The Michigan Supreme Court explained that the appellate court's attempt to analyze the issue of proximate cause was incomplete, explaining:

> An appropriate proximate cause analysis should have considered the conduct and any legal responsibility therefor of defendant, plaintiff, and the driver of the vehicle that struck plaintiff. Further, before an actor can be a proximate cause, there must be the prerequisite determination that the actor was negligent—that is, that the actor breached a duty. In this case, the panel never determined whether the driver was negligent. Without that determination, his actions could not be a proximate cause of plaintiff's injuries.  Similarly, the panel failed to correctly analyze whether plaintiff was negligent and a proximate cause of his own injuries.
> . . . .
> Finally, even if the panel had determined that another actor was negligent and was a proximate cause of plaintiff's injuries, it still would have needed to determine whether defendant's actions were '*the* proximate cause."

*Id.* 74.  Without a determination that the driver had been negligent at all, he could not be found to be "the" proximate cause of the plaintiff's injuries – especially when there was evidence that the coach and the plaintiff himself may have been negligent.

This case, however, does not involve an accidental death from a car accident such that there are issues of fact for a jury as to which human actor was "the" proximate cause of the plaintiff's injuries.  Here, it is undisputed that Berak braked and then steered his vehicle directly into Deputy Overall, striking him and causing his death.  Indeed, Berak was convicted of first degree murder in Oakland County Circuit Court for the murder of Deputy Overall.  (*See* Pl.'s Am. Compl. at ¶ 60; *see also* Lapeer Defs.' Ex. L; *People v. Berak*, 2021 WL 4024330 (Mich. App. Sept. 2, 2021) ("Affirmed, but remanded for the trial court to correct the judgment of sentence to reflect a single first-degree murder conviction supported by alternate theories of

premeditated murder and murder of a peace officer.").

Berak's actions in braking at the intersection and steering his vehicle off the road and directly into Deputy Overall undeniably represent "the one most immediate, efficient, and direct cause" of Deputy Overall's death and no reasonable jury could find otherwise. *Reilly, supra*, at *8 ("Clearly, as the district court stated, Jeremy's shooting of Rosemarie undeniably represents 'the one most immediate, efficient, and direct cause of the plaintiff's injuries.").

Accordingly, the Court rules that Defendants Paul, Boshell, Bowman, and Lutze are entitled to summary judgment as to Plaintiff's gross negligence count – the only claim asserted against them in this case.

## II.    Defendants Lapeer And Oakland Counties

Count I of Plaintiff's Amended Complaint asserts a § 1983 claim against Oakland County and Lapeer County.  The § 1983 count is the only claim asserted against the counties.

To prevail on a cause of action under § 1983, a plaintiff must prove: 1) the deprivation of a right secured by the Constitution or laws of the United States; 2) caused by a person acting under the color of state law.  *North v. Cuyahoga Cnty.*, 754 F. App'x. 380, 384 (6th Cir. 2018) (Citations omitted).

Section 1983 claims against individual state actors can be asserted against them in their individual capacity, their official capacity, or both.  A § 1983 claim against an individual in his or her official capacity is simply a claim against the municipality itself.  *Leach v. Shelby Cnty. Sheriff*, 891 F.2d 1241, 1245 (6th Cir. 1989).  If a § 1983 claim is asserted against an individual in his or her individual capacity, that individual can assert the affirmative defense of qualified immunity.  Under the doctrine of qualified immunity, government officials performing

17

discretionary functions generally are shielded from liability from civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.  *Phillips v. Roane County*, 534 F.3d 531, 538 (6th Cir. 2008).  Determining whether government officials are entitled to qualified immunity generally requires two inquiries:  1) whether, viewing the facts in the light most favorable to the plaintiff, the plaintiff has shown that a constitutional violation occurred; and 2) whether the right was clearly established at the time of the violation. *Id.*

For a municipal entity to be liable for a violation of § 1983, a plaintiff must establish: 1) a deprivation of a constitutional right; and 2) that the municipal entity is responsible for that deprivation.  *Baynes v. Cleland*, 799 F.3d 600, 620 (6th Cir. 2015) (citing *Collins v. City of Harker Heights,* 503 U.S. 115, 120 (1992)).  As explained by the Sixth Circuit:

> "[U]nder § 1983, local governments are responsible only for *their own* illegal acts. They are not vicariously liable under § 1983 for their employees' actions." *D'Ambrosio v. Marino*, 747 F.3d 378, 386 (6th Cir. 2014) (emphasis added) (quoting *Connick v. Thompson*, 563 U.S. 51, 60, 131 S.Ct. 1350, 179 L.Ed.2d 417 (2011)). "Instead, a municipality is liable under § 1983 only if the challenged conduct occurs pursuant to a municipality's 'official policy,' such that the municipality's promulgation or adoption of the policy can be said to have 'cause[d]' one of its employees to violate the plaintiff's constitutional rights." *Id.* (quoting *Monell*, 436 U.S. at 692, 98 S.Ct. 2018).
>
> "Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law." *Id.* (quoting *Connick*, 563 U.S. at 61, 131 S.Ct. 1350). To show the existence of a municipal policy, a plaintiff must properly allege at least one of the following:
>
> (1) the existence of an illegal official policy or legislative enactment;
> (2) that an official with final decision making authority ratified illegal actions;
> (3) the existence of a policy of inadequate training or supervision; or
> (4) the existence of a custom of tolerance [of] or acquiescence [to] federal rights violations.

18

*D'Ambrosio,* 747 F.3d at 386 (citation omitted).

*Berry v. Delaware Cnty. Sheriff's Office,* 796 F. App'x 857, 860-61 (6th Cir. 2019) (emphasis in original).

Typically, a plaintiff bringing a § 1983 claim against a municipality (such as a city or county) also asserts his or her § 1983 claims against individual defendants who were involved with the incident(s) at issue, who are employed by the municipality, such as police officers. For example, a plaintiff may assert § 1983 excessive-force claims against two individual police officers who arrested him and also assert a "municipal liability" claim against the city that employed them, seeking to hold the city responsible for the officers' alleged constitutional violations.

Often times, a district court will rule that the individual officers are entitled to qualified immunity based on the first prong of the qualified immunity analysis because, even when construing the facts in the light most favorable to the plaintiff, the individuals did not violate the plaintiff's constitutional rights. If that happens as to all of the individual defendants that are alleged to have violated the plaintiff's rights, then the municipal liability count asserted against the municipality fails too. *See, eg.*, *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) (Explaining that if the plaintiff "has suffered no constitutional injury at the hands of the individual police officer, the fact that the departmental regulations might have authorized the use of constitutionally excessive force is quite beside the point."); *Wilson v. Morgan,* 477 F.3d 326, 340 (6th Cir. 2007) ("[B]ecause the jury found no constitutional violation by the individual defendants, the county could not have been found liable under *Monell* for an allegedly unconstitutional custom or policy.")

If the district court finds there was a constitutional violation by the individual defendants, but that they are nevertheless entitled to qualified immunity because the right at issue was not "clearly established" at the time of the incident, that presents a different scenario. Under that scenario, the plaintiff can still seek to hold the municipality liable for the constitutional violation by the officers who were granted qualified immunity. *See Garner v. Memphis Police Dep't*, 8 F.3d 358, 365 (6th Cir. 1993).

In this case, Plaintiff has not asserted a § 1983 claim against any individual Defendants, in either their official or individual capacities. Plaintiff only asserts her § 1983 claims against Oakland and Lapeer Counties.

"Whether and under what circumstances a municipality can be liable when the plaintiff suffered a constitutional violation but cannot attribute it to any individual defendant's unconstitutional conduct" is a "complicated question" that has not been definitively answered by the Sixth Circuit. *North,* 754 F. App'x at 389 (citing *Winkler, supra*, at 899-900).

By asserting the § 1983 count against the counties alone, Plaintiff appears to contend that even if no individual county employee violated Deputy Overall's constitutional rights, the collective actions of each of the counties still rose to the level of a constitutional violation. In *Griffith*, the Sixth Circuit explained:

> This circuit has expressed a willingness to entertain this theory of municipal liability. *See Winkler*, 893 F.3d at 899–902 (assuming without deciding that municipality may be liable even if no individual employee violated plaintiff's constitutional rights); *Epps v. Lauderdale County*, 45 F. App'x 332, 334–35 (6th Cir. 2002) (Cole, J., concurring) ("A given constitutional violation may be attributable to a municipality's acts alone and not to those of its employees—as when a government actor in good faith follows a faulty municipal policy."); *see also North v. Cuyahoga County*, 754 F. App'x 380, 390–93 (6th Cir. 2018) (assuming Garcia's theory of municipal liability applies but finding plaintiffs failed to demonstrate a constitutional violation).

> *However, even under that theory, the plaintiff still must establish that he suffered a constitutional violation. See Epps*, 45 F. App'x at 334 (Cole, J., concurring); *North*, 754 F. App'x at 391 ("[B]ecause North has not demonstrated that any individual jail employee violated his Eighth Amendment right to adequate medical care by acting with deliberate indifference, he must show that the municipality itself, through its acts, policies, or customs, violated his Eighth Amendment rights by manifesting deliberate indifference to his serious medical needs."). As explained, Griffith has failed to do so here, *so we need not decide whether such a theory of municipal liability may be viable.*

*Griffith v. Franklin Cnty.*, 975 F.3d 554, 581 (6th Cir. 2020) (emphasis added).

As such, the Court will consider whether Plaintiff can establish that either Oakland County or Lapeer County violated Deputy Overall's constitutional rights.

Because of the nature of the § 1983 count in Plaintiff's First Amended Complaint, the counties assert several challenges in the pending motions.

## A. Any § 1983 Claim Asserted Against Either Of The Counties Based On The Michigan Constitution Fails To State A Claim.

Plaintiff's § 1983 count includes a reference to the Michigan Constitution. (*See* Am. Compl. at ¶ 64, alleging that Defendant's conduct deprived Deputy Overall of his rights under the United States Constitution "and pursuant to Article 1, Section 7 of the Michigan Constitution."). To the extent that Plaintiff is seeking to assert her § 1983 claim against either Lapeer County or Oakland County under Michigan's Constitution, such a claim is not cognizable under § 1983 as that statute is meant to provide a cause of action for violation of federally-created rights, not state constitutions. *Luckett v. Turner*, 18 F.Supp.2d 835, 839 (W.D. Tenn. 1998); *Pyles v. Raisor*, 60 F.3d 1211, 1215 (6th Cir. 1995) (Section 1983 does not provide redress for a violation of state law).

## B. Plaintiff Has No Cognizable Fifth Amendment Due Process Claim Against Either Of The Counties.

Plaintiff's § 1983 count asserts that the counties violated Deputy Overall's constitutional rights and makes reference to the Fifth Amendment of the United States Constitution.  (Am. Compl. at ¶ 64) (Alleging that the counties' conduct deprived Deputy Overall of his right to due process of law pursuant to the Fifth Amendment to the United States Constitution.)

The counties argue that, to the extent that Plaintiff is seeking to pursue a due process claim against them under the Fifth Amendment, such a claim fails.  (*See* Lapeer Defs.' Br. at 10).

That is correct.  *See, e.g., Scott v. Clay Cnty., Tenn*., 205 F.3d 867, 873 n.8 (6th Cir. 2000) (Explaining that "the Fifth Amendment's Due Process Clause circumscribes only the actions of the federal government."); *Myers v. Village of Alger, Ohio*, 102 F. App'x 931, 933 (6th Cir. 2004) (Affirming district court's grant of summary judgment in favor of state municipality, explaining that the plaintiff's "reliance upon the Fifth Amendment is misplaced because the Fifth Amendment applies to the federal government, not state or local governments such as the village."); *Stewart as next friend of M.S. v. Manchester Cmty. Sch*., __ F.Supp.3d __, 2022 WL 4385346 at *6 (E.D. Mich. 2022).  Plaintiff has no cognizable Fifth Amendment due process claim against either Lapeer County or Oakland County.

### C.    Plaintiff's Substantive Due Process Claim Under The Fourteenth Amendment Fails Too.

Plaintiff's § 1983 count asserts a substantive due process claim under the Fourteenth Amendment to the United States Constitution.  (Am. Compl. at ¶ 64).  That is, Plaintiff contends that Deputy Overall's right to substantive due process was violated by both Oakland County and Lapeer County.  (*Id.; see also* ECF No. 134 at PageID.5234, "Plaintiff's case against Oakland County is based on the deprivation of Eric Overall's life without due process"; ECF No. 136 at

PageID.5812, "Lapeer deprived Overall of his life without due process of law."). Plaintiff's

briefs reflect that she is seeking to establish a substantive due process claim against Lapeer

County and Oakland County under a state-created danger theory of liability.

The Fourteenth Amendment to the United States Constitution provides in pertinent part

that "[n]o state shall make or enforce any law which shall abridge the privileges or immunities of

citizens of the United States; nor shall any state deprive any person of life, liberty, or property,

without due process of law." U.S. Cont. amend. XIV, § 1. "This plain language, which restricts

deprivations *by the state*, imposes 'a limitation on the State's power to act, not . . . a guarantee of

certain minimal levels of safety and security.'" *Doe v. Jackson Local Sch. Dist. Bd. of Educ.*, 954

F.3d 925, 931 (6th Cir. 2020) (emphasis in original) (quoting *DeShaney v. Winnebago Cty. Dep't*

*of Soc. Servs.*, 489 U.S. 189, 195 (1989)). "*DeShaney* adopted this plain-text reading. It held

that social workers did not violate due process when they negligently failed to prevent a father

from abusing his son, Joshua DeShaney. *Id*. at 203, 109 S.Ct. 998. According to the Court, the

Due Process Clause's text and history showed that the clause did not compel states to protect

their residents *from a private party's violence*. *Id*. at 195–96, 109 S.Ct. 998." *Doe*, 954 F.3d at

932 (emphasis added).

Thus, *DeShaney* bars "recovery against a State for failure to protect one's life, liberty, or

property against private actors, unless the plaintiff meets one of two exceptions." *Pickle v.*

*McConnell*, 592 F. App'x 493, 493 (6th Cir. 2015). "The First exception requires the claimant to

have been in the State's custody" and, therefore, does not apply here. *Id*. The second exception,

is a state-created-danger theory of substantive due process. *Doe,* 954 F.3d at 932. The Sixth

Circuit has "gradually molded that theory into a three-part test," and has explained:

An official must initially take an "affirmative act ... that either create[s] or increase[s] the risk that the plaintiff [will] be exposed to private acts of violence." *Schroder*, 412 F.3d at 728. Next, this risk of private harm must rise to the level of a "special danger" to a specific victim that exceeds the general risk of harm the public faces from the private actor. *Jones v. Reynolds*, 438 F.3d 685, 696 (6th Cir. 2006). Last, when exacerbating this risk of harm, the official must act with a sufficiently culpable mental state. *McQueen v. Beecher Cmty. Schs.*, 433 F.3d 460, 469 (6th Cir. 2006).

*Doe*, 954 F.3d at 932.

Like some other state-created-danger cases, this one can be resolved on the third "culpability" element alone.  *See e.g., Doe*, 954 F.3d at 932.

The Sixth Circuit addressed the culpability element in *Doe*, noting its prior decisions had described this element in different ways and clarifying the correct test to be applied.  It explained:

Our decisions have described this element in different ways. Sometimes we have said that a public official either "must have known or clearly should have known that [the official's] actions specifically endangered an individual." *Kallstrom v. City of Columbus*, 136 F.3d 1055, 1066 (6th Cir. 1998); *see Engler v. Arnold*, 862 F.3d 571, 575 (6th Cir. 2017). Other times we have said that a public official must have "acted with the requisite culpability to establish a substantive due process violation[.]" *Ewolski v. City of Brunswick*, 287 F.3d 492, 510 (6th Cir. 2002).

Which test applies? The latter one more accurately articulates current law. A should-have-known framework comes close to "suggest[ing] a classic negligence formulation." *Estate of Romain*, 935 F.3d at 493–95 (Murphy, J., concurring). But a public official's negligence cannot prove a substantive-due-process violation even where the official directly inflicts the injury. *See County of Sacramento v. Lewis*, 523 U.S. 833, 848–49, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998); *Daniels v. Williams*, 474 U.S. 327, 332–33, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986). And *our recent decisions using the should-have-known test have their roots in Kallstrom, a case predating the Supreme Court's Lewis decision. E.g., Cartwright v. City of Marine City*, 336 F.3d 487, 493 (6th Cir. 2003). Since *Lewis,* we have recognized that the culpability standard that applies to state actors who indirectly allow a private party to inflict harm should not be lower than the culpability standard that applies to state actors who directly inflict that harm themselves. *See Ewolski*, 287 F.3d at 510.

24

*Doe*, 954 F.3d at 932 (emphasis added).

The Sixth Circuit then addressed the question of "What is 'the requisite culpability to establish a substantive due process violation?'" *Id.* It began by noting that the "Supreme Court has told us that the Constitution *sets a high bar* for this sort of constitutional tort." *Id.* (emphasis added). The "Supreme Court has held than an executive actor's conduct violates the Due Process Clause only if it is 'so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience.'" *Doe,* 954 F.3d at 933. In other words, "only *extreme misconduct* will violate the clause." *Id.* (emphasis added). An "actual intent to injure is required when public actors must make hasty decisions, such as during a high-speed chase or a prison riot." *Doe*, 954 F.3d at 933 (citing *Lewis, supra*).

In seeking to avoid the application of this difficult-to-meet standard, Plaintiff tries to characterize the police pursuit in this case as a "slow-speed" police pursuit. (Pl.'s Br., ECF No. 136, at 28 & 30). That is not so. The police pursuit in this case reached speeds of 70 miles per hour and more. Such speeds constitute high speed police chases. *See, eg., Jones v. Byrnes,* 585 F.3d 971, 974 (6th Cir. 2009) (Applying *Lewis's* shocks-the-conscience standard in case where the police chase at issue "reach[ed] sixty to seventy miles per hour.")

Cases involving substantive due process claims that stem from police chases are typically brought by suspects who were being pursued or third parties who were not involved in the chase. Even those cases routinely fail.[7] *See, eg.*, *Jones v. Byrnes*, 585 F.3d 971 (6th Cir. 2009)

---

[7]Indeed, in *Byrnes,* the Honorable Boyce Martin wrote a concurring opinion noting the lack of *any cases* in which an officer's actions during a high speed police chase have been found to meet the shocks-the-conscience standard. Judge Martin did so to note how that lack of caselaw impacts the qualified immunity analysis and to encourage district courts to analyze whether a constitutional violation occurred in these kinds of cases.

(affirming grant of summary judgment in favor of defendants on substantive due process claim as officer's conduct during chase (not suspending the chase after the fleeing vehicle turned off its headlights at night) does not shock the conscience or show an intent to harm); *Meals v. City of Memphis*, 493 F.3d 720 (6th Cir. 2007) (Rejecting substantive due process claim, where the defendant officer continued to pursue a suspect vehicle after the suspect exceeded the speed limit and without activating the police car's blue light or siren, because there was no evidence of an intent to injure or conscience-shocking conduct).

And here, Deputy Overall was killed in the line of duty and he was involved in the pursuit of Berak. That matters because cases wherein the "plaintiff is a government employee suing for injuries received in the line of duty" are "particularly unlikely to succeed." *Hunt v. Sycamore Commty. Sch. Dist. Bd. of Educ.*, 542 F.3d 529, 536 (6th Cir. 2008). That is because "[f]ailure to provide a safe working environment is not 'conscience-shocking, in a constitutional sense," in part because "the concept of assumption of risk is relevant in the public employee cases where the employee was hired to perform an inherently dangerous job." *Id.* at 537 & 538; *see also see also Pickle v. McConnell*, 592 F. App'x 493, 494 (6th Cir. 2015) ("Because corrections officers voluntarily enter into employment with the State and assume the risk of an inherently dangerous job, we have expressed a willingness to find the 'requisite state culpability' only where the State acted with intent to injure the officer.")

Plaintiff has not offered any evidence that could establish that any of the officers involved in the pursuit, or either Lapeer or Oakland Counties, acted with any intent to injure Deputy Overall. While the outcome of this police pursuit was truly tragic, there was no conscience-shocking conduct by any of the officers or either of the counties. Thus, Plaintiff

26

cannot establish a substantive-due-process claim under a state-created-danger theory of liability. The Court grants summary judgment in favor of both Oakland County and Lapeer County (the only defendants against whom the § 1983 count is asserted).

**D.    Municipal Liability**

Both Lapeer County and Oakland County assert that, even if the Court were to somehow find an underlying constitutional violation, Plaintiff could not establish municipal liability against them – under any of the theories advanced by Plaintiff – in any event.

Because Plaintiff has no viable underlying constitutional claim against either county, the Court need not consider those arguments. *See, eg., S.L. ex rel. K.L. v. Pierce Twp. Bd. of Trustees*, 771 F.3d 956, 962 (6th Cir. 2014). (Where no underlying constitutional violation occurred, district court did not err in granting summary judgment on municipal liability claim.). That is because there can be no municipal liability where there is no underlying constitutional violation.

**CONCLUSION & ORDER**

For the reasons set forth above, the Court GRANTS summary judgment in favor of Defendants Oakland County, Lapeer County, Paul, Boshell, Bowman, and Lutze, and DISMISSES Plaintiff's claims against them WITH PREJUDICE.

That leaves Defendant Berak as the sole remaining Defendant in this case.

IT IS SO ORDERED.


Dated:  April 26, 2023          s/Sean F. Cox
                               Sean F. Cox
                               United States District Judge


I hereby certify that a copy of the foregoing document was served upon counsel of record on

27

April 26, 2023, by electronic and/or ordinary mail.

s/Jennifer McCoy

Case Manager